UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BROOKLYN BREWERY CORPORATION, a New York Corporation,<br><br>            Plaintiff,<br><br>     v.<br><br>BLACK OPS BREWING, INC., a California Corporation,<br><br>            Defendant. | No. 1:15-cv-01656-GEB-EPG<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff The Brooklyn Brewery Corporation ("Plaintiff") moves for a preliminary injunction enjoining and restraining Defendant Black Ops Brewing ("Defendant") from using the marks "Black Ops Brewing," "Black Ops," and "blackopsbrewery.com." (Pl.'s Proposed Order Granting Prelim. Inj. 1:19-21, ECF No. 3-13.) Plaintiff has submitted evidence evincing that Plaintiff markets and sells a brand of beer bearing Plaintiff's registered trademark "Brooklyn Black Ops." (Ottaway Decl. ¶¶ 4, 5, ECF No. 3-7.) Plaintiff argues that Defendant's "continu[ed] [] use [of the marks] 'Black Ops' and 'Black Ops Brewing' despite having actual knowledge of Plaintiff's superior rights, [constitutes] deliberate[] infring[ment] [of] Plaintiff's [registered mark] and trad[es] on Plaintiff's goodwill." (Pl.'s Memo. of P & A in Supp. of Pl.'s Mot. for Prelim. Inj. ("Mot.")

1

6:22-25, ECF No. 3-1.) Plaintiff also argues: "Plaintiff will continue to suffer irreparable harm due to Defendant's intentional infringement [upon Plaintiff's registered mark] if Defendant is not preliminarily enjoined from using 'Black Ops,' 'Black Ops Brewery' and all similar marks." (Id. 21:23-25.)

## I.    FACTUAL BACKGROUND

Plaintiff has submitted averments establishing that it is a beer brewer located in New York that produces a brand of beer sold under the mark "Brooklyn Black Ops." (Decl. of Eric Ottaway ("Ottaway Decl.") ¶4, ECF No. 3-7.) The preliminary injunction factual record also contains evidence evincing that Plaintiff's "Brooklyn Black Ops" product is a Russian Imperial Stout beer that is "aged for four months in bourbon barrels, bottled flat, and re-fermented with Champagne yeast," and is currently sold on a limited seasonal basis. (Broussard Decl., ¶ 12, Ex. 39 & 40, ECF Nos. 18-1, 18-40, 18-41.)

Plaintiff declares it has sold beer under the mark "Brooklyn Black Ops" since 2007 and currently "sells beer under [this mark] in [twenty-seven] states." (Ottaway Decl. ¶¶ 4, 5.) Plaintiff's evidence demonstrates it owns a federal trademark registration for "Brooklyn Black Ops," which issued in 2009. (Ottaway Ex. 5, ECF No. 3-12.) Plaintiff avers that it has sold tens of thousands of cases of its "Brooklyn Black Ops" beer during the last eight years. (Ottaway Decl. ¶ 4.) Plaintiff further declares its beer is sold and promoted through distributors, in carefully selected retail and specialty stores, at bars and restaurants, and at festivals and entertainment events. (Id.) Plaintiff also avers: "[Plaintiff] and [its]

2

1  customers and distributors, as well as others in the trade and in

2  the media, frequently refer to the beer as simply 'Black Ops,'

3  including when purchasing it at restaurants, bars and stores."

4  (Id.)   Plaintiff declares that it has promoted its "Brooklyn

5  Black Ops" beer on its website and social media platforms,

6  through promotional events and sponsorships, print media, and

7  through promotions conducted by nationwide distributors and

8  retailers. (Id. ¶ 13.)

9        Plaintiff's averments evince that it is planning a

10 strategic launch of its entire beer portfolio, including its

11 "Brooklyn Black Ops" beer, in California, and is negotiating with

12 distributors and identifying potential retailers. (Id. ¶ 16.)

13       The preliminary injunction factual record establishes

14 that in 2015 Defendant opened a brewery called "Black Ops

15 Brewing". (Dabney Ex. 1, ECF No. 3-3.) Defendant avers that it

16 currently does not sell beer outside of Fresno County,

17 California. (Broussard Decl. ¶ 15.) Defendant further avers "it

18 uses the term 'Black Ops' only in conjunction with the name of

19 the brewery [; and that a]ll of Black Ops Brewing's beers have

20 identifying names such as Valor, Shrapnel, and the Blonde

21 Bomber." (Id.) Plaintiff provides evidence demonstrating that the

22 term "Black Ops" appears on the label of each of the above-listed

23 Defendant produced beers. (Dabney Ex. 1.)

24       Further, Plaintiff provides evidence showing that on

25 March 24, 2015, Defendant applied for registration of the mark

26 "Black Ops Brewing" for beer and taproom services with the United

27 States Patent and Trademark Office ("PTO") on the Principal

28 Register. (Dabney Ex. 3, ECF No. 3-5.) On July 1, 2015 the PTO

1  issued an official letter rejecting Defendant's application.
2  (Dabney Ex. 4, ECF No. 3-6.) The PTO explained in the letter that
3  Defendant's mark "is highly similar in sound, appearance, meaning
4  and overall commercial impression to registrant's mark, Brooklyn
5  Black Ops." (Id.) The PTO also stated in the letter that the
6  parties' goods are identical (both beer), and that Defendant's
7  taproom services are related to the goods and services to which
8  Plaintiff's registered mark applies. (Id.) Further, the PTO
9  stated: "[i]t is likely that consumers will mistakenly believe
10  the goods and services emanate from the same source." (Id.) The
11  PTO also stated: "The overriding concern is not only to prevent
12  buyer confusion as to the source of the goods and services, but
13  to protect the [Plaintiff] from adverse commercial impact due to
14  use of a similar mark by a newcomer." (Id.)

15          Plaintiff provides evidence that supports its argument
16  that notwithstanding the PTO's rejection of Defendant's trademark
17  registration application, Defendant continues promoting and
18  selling beer and taproom services under the mark "Black Ops
19  Brewing." (Dabney Ex. 1.) Specifically, Plaintiff's evidence
20  shows that Defendant sells its beer through retail and specialty
21  stores, as well as at bars and restaurants; (Dabney Ex. 2, ECF
22  No. 3-4) and that Defendant advertises its beer and services on
23  its website at "blackopsbrewing.com" and on its Facebook page.
24  (Dabney Ex. 1 & 2.) Plaintiff avers that both Plaintiff and
25  Defendant's beer bottle products appear black as sold at retail,
26  are oversized, and are sold at retail in a single bottle, as
27  opposed to in six-packs. (Ottaway Decl. ¶¶ 10, 15.)

28          Plaintiff also avers that on July 20, 2015, Plaintiff

4

1  sent Defendant a letter demanding that Defendant cease all use of
2  the marks "Black Ops" and "Black Ops Brewing." (Dabney Decl. ¶
3  9.) Plaintiff has also provided evidence that Plaintiff renewed
4  its cease and desist demand on August 27, 2015. (Id.) Plaintiff's
5  evidence shows that Defendant continues using the marks to
6  promote and sell beer and taproom services. (Dabney Ex. 1 & 2.)

## II.   LEGAL STANDARD

8  To obtain a preliminary injunction, Plaintiff "must
9  establish that [(1)] [it] is likely to succeed on the merits,
10  [(2)] that [it] is likely to suffer irreparable harm in the
11  absence of preliminary relief, [(3)] that the balance of equities
12  tips in [its] favor, and that [(4)] an injunction is in the
13  public interest." See Serv., Inc. v. Winsor Grain, Inc., 868 F.
14  Supp. 2d 998, 1001 (E.D. Cal. 2012). A preliminary injunction is
15  considered an "extraordinary remedy that may only be awarded upon
16  a clear showing that the plaintiff is entitled to such relief."
17  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).

## III.   DISCUSSION

### A. Likelihood of Success on the Merits

20  Plaintiff's Complaint consists of two claims under the
21  Lanham Act and two California state claims, all of which are
22  premised upon trademark infringement allegations. These claims
23  are "substantially congruent" and therefore they can all be
24  analyzed under the federal trademark Lanham Act. Clearly v. News
25  Corp., 30 F.3d 1255, 1263 (9th Cir. 1994).

26  To establish a trademark infringement claim under the
27  Lanham Act, Plaintiff "'must prove: (1) that it has a protectable
28  ownership interest in the mark; and (2) that the defendant's use

1  of the mark is likely to cause consumer confusion.'" Network

2  Automation , Inc. v. Advanced Sys. Concept, Inc., 638 F.3d 1137,

3  1144 (9th Cir. 2011) (quoting Dep't of Parks & Recreation v.

4  Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)).

5      **1. Plaintiff's Protectable Ownership Interest in the**

6          **Marks**

7      Plaintiff argues: "With respect to the first element

8  for infringement, Plaintiff owns an **incontestable** federal

9  registration for 'Brooklyn Black Ops'" and cites to Exhibit 5

10  attached to the Ottaway Declaration (ECF No. 3-12) in support of

11  its argument.  Mot. 9:2-5.  This exhibit shows Plaintiff owns a

12  federal trademark registration for the mark "Brooklyn Black Ops,"

13  which issued for beer in 2009.[1] Under the Lanham Act "[a] mark

14  attains incontestable status in a category if the registrant

15  continuously uses the mark for five consecutive years after

16  registering it in that category . . . ." Entrepreneur Media, Inc.

17  v. Smith, 279 F.3d 1135, 1139 n.1 (9th Cir. 2002) (citing Lanham

18  Trade-Mark Act, 15 U.S.C. § 1065[2]). Plaintiff avers that it has

19  continuously sold, and continues to sell, its "Brooklyn Black

20  Ops" product since the mark's registration in 2009. (Ottaway

21  Decl. ¶¶ 4,5.) Therefore, Plaintiff's evidence demonstrates that

22

23  [1] Plaintiff also supports its likelihood of success argument by contending it
    "owns a common law mark for 'Black Ops' for beer." (Mot. 9:10.) Defendant

24  counters that "[c]ommon law trademarks are only enforceable within the
    geographic region where the trademark owner was using it in business." (Opp'n

25  11:2-4 (citing Optimal Pets, Inc. v. Nutri-Vet, LLC, 877 F. Supp. 2d 953, 958-
    59 (C.D. Cal. 2012)).) However, this issue need not be decided in light of
    rulings on other issues.

26  [2] 15 U.S.C. § 1065 prescribes: ". . . the right of the owner to use [its]
    registered mark in commerce for the goods or services on or in connection with

27  which such registered mark has been continuous for five consecutive years
    subsequent to the date of such registration and is still in use in commerce,

28  shall be incontestable . . .".

1   it owns an incontestable federal registration for "Brooklyn Black
2   Ops" for beer.

3         When a mark achieves incontestable registration status,
4   15 U.S.C. § 1115(b) prescribes that this status is "prima facie
5   evidence of the validity of the registered mark and of the
6   registration of the mark, of the registrant's ownership of the
7   mark, and of the registrant's exclusive right to use the
8   registered mark in commerce or in connection with the goods or
9   services specified in the registration." Accordingly, Plaintiff
10  has demonstrated it has a protectable ownership interest in its
11  "Brooklyn Black Ops" mark.

12            **2. Likelihood of Consumer Confusion**

13        Plaintiff further argues that "[w]ith respect to the
14  second element for infringement, Defendant's use of 'Black Ops'
15  and 'Black Ops Brewing' (collectively, 'Defendant's Marks')
16  creates a likelihood of confusion with . . . Plaintiff's Brooklyn
17  Black Ops . . . mark[]." (Mot. 10:2-6.)

18        Defendant counters: "there is simply no merit to the
19  Plaintiff's bare assertion of public confusion between the
20  Plaintiff's 'Brooklyn Black Ops' aged Russian Imperial Stout
21  product and Defendant's products merely because 'Black Ops'
22  appears on the label." (Def.'s Opp'n to Pl.'s Mot. for Prelim.
23  Inj. ("Opp'n") 1:15-18, ECF No. 18.)

24        "[T]he likelihood of confusion is the central element
25  of a trademark infringement action." CytoSport, Inc. v. Vital
26  Pharm., Inc., 617 F. Supp. 2d 1051, 1065 (E.D. Cal. 2009). In AMF
27  Inc. v. Sleekcraft Boats, the Ninth Circuit developed the
28  following eight factors to guide the determination of likelihood

of confusion:

      1. strength of the mark;

      2. proximity of the goods;

      3. similarity of the marks;

      4. evidence of actual confusion;

      5. marketing channels used;

      6. type of goods and degree of care likely to be exercised by the purchaser;

      7. Defendant's intent in selecting the mark; and

      8. likelihood of expansion of the product lines.

AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-349 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792, 810 n.19 (9th Cir. 2003).

"The list of factors is not a scorecard — whether a party 'wins' a majority of the factors is not the point. Some factors are much more helpful than others, and the relative importance of each individual factor will be case specific. [I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." Thane Int'l v. Trek Bicycle Corp., 305 F.3d 894, 901 (9th Cir. 2002) (citations and internal quotations omitted).

### a. Strength of the Mark

"Trademark law offers greater protection to marks that are 'strong,' i.e., distinctive. The strength of a mark is determined by its placement on a 'continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection.'" E. & J. Gallo Winery v.

1    <u>Gallo Cattle Co.</u>, 967 F.2d 1280, 1291 (9th Cir. 1992) (quoting

2    <u>Nutri/Sys., Inc. v. Con-Stan Indus., Inc.</u>, 809 F.2d 601, 605 (9th

3    Cir. 1987)). "Arbitrary marks are common words that have no

4    connection with the actual product — for example, 'Dutch Boy'

5    paint." <u>Gerawan Farming, Inc. v. Prima Bella Produce, Inc.</u>, No.

6    CV F 10-0148 LJO JLT, 2011 WL 3348056 at *17 (E.D. Cal. Aug. 2,

7    2011) (citing <u>Dreamwerks Prod. Grp., Inc. v. SKG Studio</u>, 142 F.3d

8    1127, 1130, n. 7 (9th Cir. 1998)).

9         Plaintiff argues it "selected the name 'Black Ops' to

10   refer to a 'secret mission or campaign carried out by a military,

11   governmental, or other organization.'" (Mot. 3:8-11.) Plaintiff

12   contends its mark is "arbitrary because 'Black Ops' does **not**

13   describe of suggest the nature or character of Plaintiff's beer."

14   (<u>Id.</u> 17:5-7.)

15        Defendant counters: "As 'Brooklyn' refers to the

16   geographic area and brewery that produces the product, 'Black'

17   refers to a dark beer, and 'Ops' is suggestive of hops, an

18   ingredient in beer; the mark is, at best, merely suggestive."

19   (Opp'n 12:14-16.)

20        Plaintiff replies that that Defendant "improperly

21   dissects" the unitary phrase "Black Ops". (Pl.'s Reply in Supp.

22   of Mot. for Prelim. Inj. ("Reply") 2:14 n. 1, ECF No. 21.)

23        "A court may not review the validity of a composite-

24   term trademark by 'dissecting' the term and reviewing the

25   validity of its component parts individually." <u>Self-Realization

26   Fellowship Church v. Ananda Church of Self-Realization</u>, 59 F.3d

27   902, 912 (9th Cir. 1995). Plaintiff's mark "Brooklyn Black Ops,"

28   taken as a whole, does not describe or suggest a particular

quality of Plaintiff's beer. Plaintiff's mark "consists of common words arranged in an arbitrary way that is non-descriptive of any quality of [its product and is therefore] arbitrary and is 'awarded maximum protection.'" Off. Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1390 (9th Cir. 1993).

### b. Proximity of the Goods

The "proximity of the goods" factor concerns the relatedness of goods. "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sleekcraft, 599 F.2d at 350. "The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." Id.; see also CytoSport, Inc., 617 F.Supp.2d at 1066, aff'd, 348 Fed. Appx. 288 (9th Cir. 2009) ("It is well established that the greater the similarity between the products or services, the greater the likelihood of confusion.") "Thus, less similarity between the marks will suffice when the goods are complementary, the products are sold to the same class of purchasers, or the goods are similar in use and function." Id. (internal citations omitted).

Plaintiff argues: "[t]he parties offer identical products — beer — under their marks." (Mot. 14:14.)

Defendant counters:

> The Plaintiff's "Brooklyn Black Ops" is a highly specialized product (a Russian Imperial Stout beer that is "*aged for four months in bourbon barrels, bottled flat, and re-fermented with Champagne yeast*") that sells for $29.99 a bottle. See, e.g., Pom Wonderful, LLC v. Robert G. Hubbard, 775 F.3d

> 1118, 1127 (9th Cir. 2014)(purchasers of more
> expensive goods are expected to be more
> discerning and less likely to be confused).
> On the other hand, Defendant Black Ops
> Brewing, Inc. does not make any aged beers or
> Russian Imperial Stouts. Instead, its beers
> retail for less than $7.00 a bottle and
> consist of far less exotic fare; such as
> IPAs, browns, and reds. Significant
> differences in price decreases the likelihood
> of confusion. L.A. Gear, Inc. v. Thorn McAn
> Shoe Co., 988 F.2d 1117, 1134 (Fed. Cir.
> 1993).

(Opp'n 12:28-13:9.)

Both Plaintiff and Defendant use the mark in connection with the sale of beer. Therefore, this factor 'weighs heavily' in favor of finding a likelihood of confusion. See Sweetwater Brewing Co., LLC v. Great Am. Rests., Inc., 266 F. Supp. 2d 457, 463 (E.D. Va. 2003)(finding infringement as a matter of law because each party sold microbrews); see also Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc., 288 F.Supp.2d 105, 118 (D.N.H. 2003), aff'd, 105 Fed. Appx. 285 (1st Cir. 2004)(finding no distinction between ale and lager for likelihood of confusion purposes because they are both "beers").

### c. Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning. Each must be considered as they are encountered in the marketplace. Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." Sleekcraft, 599 F.2d at 351.

Each party's mark appears on the products respective photographed below:

**Plaintiff:**   **Defendant:**



Plaintiff contends that "the . . . marks are identical or substantially identical in sight, sound and meaning." (Mot. 11:9-10.) Specifically Plaintiff argues:

> On beer bottles, Plaintiff's mark "Black Ops" is displayed in all-capitalized, large-block, white letters, with "Brooklyn" in smaller, deemphasized letters and coloring. (See, eg., Ottaway Decl. ¶ 10 & Ex. 1.) On beer bottles, Defendant's mark "Black Ops" is displayed in all-capitalized, large-block, white letters, with "Brewing, Inc." in smaller letters. (See, e.g., Dabney ex. 2 at p. 11.) "Black Ops" is spelled and pronounced identically in the parties' marks. The size and the color of the parties' bottles themselves are substantially similar, as both bottles are over-sized and appear black while on sale at retail with liquid in them. (Ottaway Decl. ¶¶ 10, 15 & Ex. 1; Dabney Ex. 2 at p. 11.) The parties' beer bottles are sold at retail as singles. (Id.) . . . Thus the parties' marks are substantially identical in sight, sound and meaning.

(Mot. 11:22-12:7.)

> Moreover, "[i]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight, because it would be used by purchasers to

1      request the goods." . . . This is
       particularly the case with alcohol beverages,
2      which are "frequently purchased at bars and
       clubs without the purchaser seeing any
3      bottles or labels."

4   (Mot. 12:16-13:8-10 (internal citations omitted).)

5          Defendant counters that "[i]n this dispute, the names

6   and logos of the parties are not the same." (Opp'n 14:5.)

7   Specifically Defendant rejoins:

8      The Plaintiff utilizes a large circular logo
       featuring a prominently displayed white "B"
9      on a green circle backdrop, with "Brooklyn"
       in large capitalized letters over it, and
10     "Brewery" capitalized on the bottom. It does
       not utilize "Black" or "Ops" in its trade
11     name. Its *Brooklyn Black Ops*" aged Russian
       Imperial Stout product uses a completely
12     black 750 ml bottle and a champagne style
       cork closing device. The bottle features a
13     large silver circle logo with a stylized "B"
       in the center and a prominent label bearing
14     the name "*Brooklyn Black Ops*." It also
       features a second stylized "B" in raised
15     relief using a circle emblem.

16     In contrast, the Defendant's beers have
       identifying names like the "*Blonde Bomber*,"
17     "*Recon Red*," "*Bayonet Brown*," and "*Shrapnel*."
       . . . Its emblem is red, white and blue and
18     reminiscent of aviator wings. The Defendant's
       bottles are standard 22 oz. amber bottles,
19     topped with a standard bottle cap; that
       prominently feature the individual product
20     names and labels. It uses the term "Black
       Ops" only in conjunction with the name of the
21     brewery.

22   (Opp'n 14:5-21.)

23         "[I]n the case of alcoholic beverages, the degree of

24   similarity need not be as high as usual since the likelihood of

25   confusion is greater because drinks are frequently purchased at

26   bars and clubs without the purchaser seeing any bottles or

27   labels." A. Smith Bowman Distillery, Inc. v. Schenley Distillers,

28   Inc., 198 F.Supp. 822, 827-828 (D. Del. 1961). Defendant points

to differences between the labels. However, the sounds and meanings of the two marks are identical. Further, alcoholic beverages are often consumed in environments in which similarity in sound and meaning are likely to factor heavily in building consumer brand recognition and trademark association. Id. Therefore, this factor weighs in favor of finding a likelihood of confusion.

### d. Evidence of Actual Confusion

"Evidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely." Sleekcraft, 599 F.2d at 352. However, "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." Id. at 353. "Consequently, this factor is weighed heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." Id.

Plaintiff argues: "Plaintiff does not yet have evidence of actual confusion, as Defendant has just commenced sales and its volume is relatively low. Moreover, Plaintiff will not commence sales in California until 2016. Thus, this factor is neutral in the likelihood of confusion analysis." (Mot. 20:24-21:1.)

This factor weighs against finding of a likelihood of confusion.

### e. Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353. "In assessing

14

marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014). "Marketing channels can converge even when different submarkets are involved so long as 'the general class of . . . purchasers exposed to the products overlap.'" Id.

Plaintiff contends:

> Defendant's beer is promoted and sold in the same trade channels where Plaintiff's beer is sold, and in some of the same stores where Plaintiff's beer is likely to be sold. Further, the parties use similar promotional methods, including their respective websites and Facebook, to promote their beers. Finally, the parties' products are craft beer which is marketed to the same class of consumers. Thus, the parties' trade channels are nearly identical.

(Mot. 16:7-16 (internal citations omitted).)

Plaintiff argues that it is "negotiating with California distributors to commence distribution of its 'Brooklyn Black Ops' . . . beer in 2016, at which time Plaintiff's beer will be available in retail stores, bars, and restaurants throughout California." (Mot. 15:25-28.)

Defendant rejoins:

> [T]he parties do not share the same marketing channels. The Plaintiff uses distributors and sells its products east of the Mississippi. It has not sold its goods on the West Coast, including California. On the other hand, the Defendant's goods are sold only in Fresno County, California. It has no sales force or distributors. Approximately three (3) restaurants (in Fresno and Clovis, California) carry its beer on tap and two stores (both in Fresno) sell bottles of its beer. The Defendant has never sold any of its products outside of Fresno County, California and thus, it has never sold any beer in any location where "Brooklyn Black Ops" aged

1  Russian Imperial Stout, or any other of the
   Plaintiff's products are available.
2

3  (Opp'n 15:23-16:4.)

4  Both parties utilize online social media to promote

5  their beer, and distribute their alcohol through retail stores

6  and restaurants. Moreover, Plaintiff is in the process of

7  negotiating with distributors for its product in California and

8  identifying potential retailers so that it could expand sales of

9  its "Brooklyn Black Ops" Russian Imperial Stout to California.

10 Where a federal registrant evinces a "present likelihood that the

11 federal registrant will expand [its product's] use into the area

12 of use of the intrastate user" the registrant is "entitled under

13 the authority of the Lanham act to injunctive relief." <u>Mister</u>

14 <u>Donut of America, Inc. v. Mr. Donut, Inc.</u>, 418 F.2d 838, 844 (9th

15 Cir. 1969). Therefore the marketing channels converge factor

16 weighs in favor of finding a likelihood of confusion.

17 **f. Type of Goods and the Degree of Care Likely to**

18 **be Exercised by the Purchaser**

19 "We examine the relatedness of the parties' goods

20 because the more closely related the goods are, the more likely

21 consumers will be confused by similar marks . . . Related goods

22 are those products which would be reasonably thought by the

23 buying public to come from the same source if sold under the same

24 mark. In practice, this definition does not necessarily require a

25 close proximity before goods will be found related." <u>Entrepreneur</u>

26 <u>Media, Inc. v. Smith</u>, 279 F.3d 1135, 1147(9th Cir.

27 2002)(citations and quotations omitted).

28 Plaintiff argues in relevant part: "The goods here are

craft beers, which retail for under $30. These 'common consumer items' are regularly purchased by consumers not exercising a high degree of care." (Mot. 18:19-22.)

Plaintiff further contends:

> [T]he conditions under which consumers purchase beers are frequently so "chaotic" and "impuls[ive]" that less similarity between marks used on beer is needed for a finding of likelihood of confusion than the similarity required for other types of products. Guinness, 2002 WL 1543817 at * 6 ("chaotic conditions under which alcoholic beverages are purchased in bars, and the impulse nature of these purchases" support a likelihood of confusion – granting preliminary injunction); . . .

(Id. 19:7-13.)

Defendant counters that Plaintiff's "Brooklyn Black Ops" beer "sells for $29.99 a bottle" and "[a] craft beer consumer who is willing to pay over $29.00 a bottle for a premium Russian Imperial Stout . . . is not likely to mistake a blonde or an IPA produced by Black Ops Brewing for such a premium and specialized product simply because somewhere on the bottle, the words 'Black Ops' can be found." (Opp'n 16:27-17:4.)

> In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous. When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again though confusion may still be likely.

Sleekcraft, 599 F.2d at 353 (internal citations omitted).

Beer is a "common consumer[] item[] and [is] often

purchased several times a year[;] [a] reasonable consumer . . . is [therefore] unlikely to exercise a high degree of care in selecting" beer. K-Swiss, Inc. v. USA AISIQI Soes Inc., 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003); see also Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc., No. 02 CIV.0861(LMM), 2002 WL 1543817, at *6 (July 12, 2002) ("[High end] [b]eer and scotch  are relatively low cost products, and the average consumer is not likely to seek to identify the true manufacturer of these products."). Therefore, due to the relatively inexpensive nature of the parties' beer products and the "chaotic" environment in which the parties' products are likely to be purchased this factor weighs in favor of finding a likelihood of confusion.

### g. Defendant's Intent in Selecting the Mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354.

Defendant argues that "[a]t the time of the selection of the name, the Defendant was not aware of the existence of Plaintiff['s mark] . . . ." (Opp'n. 17:11-12.) "[T]he Defendant selected 'Black Ops Brewing, Inc.' for its name to honor the owners family members' military service and because their friends and neighbors serve in the local military installations." (Id. 17:8-10.) Even though the injunctive record supports Defendant's assertion that it selected its mark in good faith, Defendant continued using its mark after it became aware of Plaintiff's registered mark.  Although "[g]ood faith is less probative of the

1  likelihood of confusion, [and] may be given considerable weight

2  in fashioning a remedy," the good faith Defendant has shown in

3  its initial selection of the mark does not cause this factor

4  weighs in Defendant's favor. Sleekcraft, 599 F.2d at 354.

5  **h. Balance of the Pertinent Sleekcraft Factors**

6  Having examined the pertinent Sleekcraft factors, the

7  injunctive record evinces that Defendant's use of the marks

8  "Black Ops Brewing," "Black Ops," and "blackopsbrewery.com." is

9  "creates a likelihood that the consuming public will be confused

10 as to who makes what product." Thane Intern., 305 F.3d at  901.

11 **B. Irreparable Harm**

12 "To be entitled to injunctive relief, it is not

13 sufficient that [P]laintiff demonstrate a likelihood of success

14 on the merits of its claims. Plaintiff must also demonstrate that

15 absent the injunction, it will be irreparably harmed by

16 [D]efendant's alleged infringing conduct." CytoSport, 617 F.

17 Supp. 2d at 1080.

18 Plaintiff contends:

19    Plaintiff will continue to suffer irreparable
20    harm due to [D]efendant's intentional
      infringement if Defendant is not
21    preliminarily enjoined from using "Black
      Ops," "Black Ops Brewery" and all similar
22    marks. Plaintiff is planning its strategic
      and long-anticipated launch of its entire
23    beer portfolio, including its popular "Black
      Ops" beer, in California. Defendant's acts
24    have robbed Plaintiff of control over the
      reputation of the beer sold under the "Black
25    Ops" mark – a reputation which Plaintiff has
      spent eight years and a substantial amount of
26    resources building and carefully cultivating
      – at a time when Plaintiff is most relying on
27    that reputation to support its expansion.

28 (Mot. 21:23–22:4.)

1      Plaintiff further argues that "California consumers who
2  anticipate the availability of Plaintiff's 'Black Ops' brand in
3  California will be misled by Defendant's preemptive flooding of
4  the California market with its imposter brand." (Id. 22:23-26.)
5  Plaintiff contends: "retailer interest in carrying Plaintiff's
6  beer is likely to be weakened by the existence of Defendant's
7  brand, as retailers are likely to perceive the parties' brands to
8  be the same or interchangeable." (Id. 23:3-5.)

9      Moreover, Plaintiff argues:

10         Because Plaintiff does not control the retail
           establishments to which Defendant sells
11         "Black Ops" beer, the irreparable injury to
           Plaintiff is substantially magnified because
12         the cache and aura around which Plaintiff's
           "Black Ops" brand has been built will be
13         destroyed, which will cause the further loss
           of customers and goodwill. Finally in this
14         regard, consumers who are unsatisfied with
           Defendant's "Black Ops" beer will be unlikely
15         to purchase Plaintiff's "Black Ops" beer
           thinking that it is connected with the "Black
16         Ops" beer that they did not enjoy.

17  (Id. 23:12-19 (internal citations omitted).)

18      Defendant counters: "Plaintiff's motion fails to
19  provide any evidence, let alone the required clear showing that
20  it will be immediately irreparably harmed if a preliminary
21  injunction does not issue." (Opp'n 19:3-5.)

22         In trademark cases, courts have found
           irreparable harm in the loss of control of a
23         business's reputation, a loss of trade and
           loss of goodwill. Opticians Ass'n of Am. v.
24         Indep. Opticians of Am., 920 F.2d 187, 195
           (3rd Cir. 1990). Trademarks serve as the
25         identity of their owners and in them resides
           the reputation and goodwill of their owners.
26         Thus, if another person infringes the marks,
           that person borrows the owner's reputation
27         whose quality no longer lies within the
           owner's control. Id. A trademark owner's loss

28                               20

1          of the ability to control its marks, thus
           create the potential for damage to its
2          reputation. Id. at 196.

3  CytoSport, Inc., 617 F. Supp. 2d at 1080.

4          In the context of trademark law, a finding of

5  irreparable harm must be grounded in evidence not in conclusory

6  or cursory allegations. Herb Reed Enterprises, LLC v. Florida

7  Entertainment Management, Inc., 736 F.3d 1239, 1249-1251 (9th

8  Cir. 2013), cert denied, 135 S. Ct. 57 (2014).

9          Plaintiff evidence demonstrates that Defendant's use of

10  the marks "Black Ops Brewing," "Black Ops," and

11  "blackopsbrewery.com." will cause Plaintiff to lose its ability

12  to control its brand reputation and goodwill, since what could be

13  perceived by consumers as the quality of Plaintiff's product

14  risks no longer being within Plaintiff's control.  In trademark

15  cases, courts have found irreparable harm in the loss of control

16  of a business's reputation, a loss of trade and loss of goodwill.

17  CytoSport, Inc., 617 F. Supp. 2d at 1080.

18          "Irreparable harm must be of a peculiar nature, so that

19  compensation in money alone cannot atone for it. Grounds for

20  finding irreparable injury include loss of control of reputation,

21  loss of trade, and loss of good will." Opticians Ass'n of America

22  v. Independent Opticians of America , 920 F.2d 187, 195 (3d Cir.

23  1990).  If Defendant uses Plaintiff's mark, Defendant "borrows

24  the [Plaintiff's] reputation, whose quality no longer lies within

25  [Plaintiff's] own control. This is an injury, even though the

26  borrower does not tarnish it, or divert any sales by its use" and

27  "creates the potential for damage to [Plaintiff's] reputation.

28  Potential damage to reputation constitutes irreparable injury for

1   the purpose of granting [Plaintiff's request for] a preliminary

2   injunction . . . ." Id.

3        **C. Balance of the Equities**

4        Plaintiff argues: "Any potential harm to Defendant that

5   may result from being preliminarily enjoined from infringing

6   Plaintiff's marks – an unlawful activity – is legally irrelevant

7   in light of Plaintiff's overwhelming likelihood of success on the

8   merits and the massive irreparable harm caused to Plaintiff by

9   Defendant's conduct." (Mot. 8-12.)

10        Defendant counters:

11        Here, the Plaintiff does not sell any beer in
          this state, let alone the sole county where
12        the Defendant operates. In the highly
          unlikely event that any consumer is somehow
13        confused between the Defendant's beer and the
          Plaintiff's "Brooklyn Black Ops" aged Russian
14        Imperial Stout product, then the Plaintiff as
          the more established and sizable business can
15        easily address such minor identity problems.
          Therefore, the balance of the hardships also
16        weighs heavily against the issuance of a
          preliminary injunction.
17

18   (Opp'n 20:4-9.)

19        Any harm suffered by Defendant will result from being

20   enjoined from engaging in unlawful trademark infringement. See

21   Triad Sys. Corp. v. Southeastern Express Co., 64 F.3d 1330, 1338

22   (9th Cir. 1994) (Defendant "cannot complain of the harm that will

23   befall it when properly forced to desist from its infringing

24   activities.") Therefore the balance of equities weighs in favor

25   of Plaintiff.

26        **D. Public Interest**

27        "In the trademark context, courts often define the

28   public interest at stake as the right of the public not to be

1   deceived or confused." _CytoSport_, 617 F. Supp. 2d at 1081.

2           Plaintiff has demonstrated a likelihood of consumer

3   confusion. Therefore, the public interest weighs in favor of

4   issuing a preliminary injunction.

5                       **IV.     CONCLUSION**

6           For the foregoing reasons, Plaintiff's motion for a

7   preliminary injunction is GRANTED upon the terms set forth as

8   follows:

9   1.    Plaintiff The Brooklyn Brewery Corporation shall post a

10        bond in the amount of $85,000.00 with the Clerk within

11        fourteen (14) days from the date on which this Order is

12        filed. The injunction shall be effective immediately upon

13        the Court's receipt of Plaintiff's bond.

14  2.    Defendant Black Ops Brewing, Inc., its principals,

15        employees, owners, agents, officers, directors,

16        attorneys, representatives, affiliates, subsidiaries, and

17        successors and assigns, and all those in active concert

18        or participation with any of them, are preliminary

19        enjoined and restrained from using the marks "Black Ops

20        Brewing," "Black Ops," "blackopsbrewery.com," or any

21        other mark that infringes or unfairly competes with

22        Plaintiff's "Brooklyn Black Ops" mark.

23  Dated:  January 6, 2016

24

25  _____

26  GARLAND E. BURRELL, JR.
    Senior United States District Judge

27

28